**STATE of Minnesota, Respondent,**

v.

**Morris Jerome PENDLETON, Jr., Appellant.**

**No. A05–1758.**

Supreme Court of Minnesota.

Jan. 11, 2007.

---

720

Mark D. Nyvold, St. Paul, MN, for Appellant.

Lori Swanson, Minnesota Attorney General, Kimberly Parker, Assistant Attorney General, St. Paul, MN, Michelle Ann Dietrich, Redwood County Attorney, Redwood Falls, MN, for Respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

A jury found appellant Morris Jerome Pendleton, Jr., guilty of first-degree premeditated murder and first-degree felony murder while committing kidnapping for the death of Robert Berry, Jr. The district court sentenced Pendleton to life imprisonment without the possibility of parole for first-degree felony murder while committing kidnapping. Pendleton appeals, arguing that the district court erred when it: (1) overruled Pendleton's *Batson* objection to the state's peremptory challenge of a prospective juror; (2) admitted evidence of two of Pendleton's prior criminal convictions for impeachment purposes; and (3) instructed the jury regarding felony murder while committing kidnapping. We affirm.

Robert Berry, Jr.'s body was found in the Minnesota River on September 25, 2004. Witnesses testified to the following facts, but Pendleton disputes some of the events leading to Berry's death and the disposition of the body.

On the evening of September 23, 2004, Shelly Williams hosted a party in Morton, Minnesota. Guests at the party included Pendleton, Keith Crow, Vernon Jones, J.P., and W.S. ("the five men"), all of whom were principally involved in Berry's death. Other party guests included Alicia Connor[1] and L.B., among others. Approximately 15 people attended the party, many of whom were consuming alcohol and smoking marijuana.

---

1. Alicia Connor testified for the state pursuant to a plea agreement.

Berry arrived later and began arguing with J.P. The confrontation escalated, and they began punching one another. Crow came to J.P.'s aid, and both proceeded to punch and kick Berry. Soon Berry was bleeding and unconscious on the floor. One witness, S.E., saw Morris Pendleton stomp on Berry.

During the fight, many of the guests left the party, leaving Berry, Pendleton, Crow, Jones, J.P., W.S., Connor, Williams, and L.B. The five men robbed Berry, taking his wallet, jewelry, and car keys. The five men, Connor, Williams, and L.B. left Berry unconscious in the dining room and took Berry's Chevrolet Tahoe for a ride, with Pendleton driving. During the drive, Pendleton suggested that J.P. stab Berry and cut off his head. Crow agreed and suggested that Berry's body be dumped in the river.

The group returned to Williams's house, where Berry continued to lie unconscious. The five men carried Berry, who was wrapped in a blanket, out to the Tahoe, placing him in the rear of the vehicle. Crow told Williams and L.B. to stay at the house and clean up Berry's blood. As the rest of the group got into the Tahoe, Pendleton warned Williams that her child would be harmed if she told anyone what happened.

Pendleton drove the Tahoe toward the Minnesota River, taking Oxford Avenue, a rural dirt road, which branches off to a trail that leads down to the river. After backing the Tahoe up to an embankment, the five men took Berry out of the back and dragged him down the embankment to the riverbank. Connor remained with the Tahoe. Five to ten minutes later, the men returned one at a time. Pendleton returned first and said that J.P. fell into the river. When all five men had returned,

Pendleton said, "[W.S.] had got him good," and he also mentioned that he had blood on his shoes.

Pendleton suggested burning the Tahoe, and he drove the group to his parents' house where he retrieved a can of gas. They drove back to Oxford Avenue after dropping off W.S. and Jones. Connor and Crow got out of the Tahoe some distance down Oxford Avenue, and Pendleton and J.P. continued down the road. The Tahoe was burning a few minutes later. Two police officers soon arrived at the scene, but they never saw Pendleton.

Pendleton later arrived at Floyd Fischer's house, asked Fischer for a pair of shoes because his were "bloody and muddy," and also asked for a ride because there were police around. When asked what Pendleton told him about the night's events, Fischer responded: "That they torched the vehicle and that they stabbed up Junior."[2] Sandra Larsen–Matray, Fischer's daughter, gave Pendleton a ride to his parents' house, and he told her about dumping a body in the river, torching a vehicle, and running from the police.

Berry's autopsy revealed fifteen stab wounds to his chest. Based on the groupings and angles of the stab wounds, Dr. Paul Nora testified that there was a greater chance than not that there were multiple stabbers. Dr. Nora also determined that the stab wounds caused Berry's death.

Evidence recovered at or near the crime scene included two tee-shirts. Analysts determined that among the people involved, one tee-shirt contained a mixture of DNA from which only Berry and Pendleton could not be excluded. Defense counsel argued that this shirt was worn by J.P. and contained Pendleton's DNA because J.P. had borrowed the shirt from

2.  Robert Berry, Jr., was also known as "Jun-     ior."

Pendleton when they had recently stayed at the same house.

Pendleton testified at trial. He denied participating in Berry's beating at the party. He also denied ever driving Berry's Tahoe, stating that J.P. drove. He testified that he never suggested that Berry be killed, and he did not help the others carry Berry to the Tahoe or place him in the vehicle. Pendleton testified that once at the river embankment, he did not help take Berry out of the Tahoe, and he remained at the top of the embankment, where he witnessed J.P. stab Berry at least twice. He testified that he then left through a cornfield, arriving at Floyd Fischer's house two hours later. While on the way to Fischer's, Pendleton stated that he saw a fire and emergency vehicles in the distance.

On September 24, 2004, Pendleton and his girlfriend, Jamie Renville, went to Renville's house in Sisseton, South Dakota. Sometime during the following two days, Pendleton went to Minneapolis, where he turned himself in to police on October 4. In statements to police, Pendleton initially denied even witnessing the stabbing.

Pendleton was indicted on three counts of first-degree murder: Count I—premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2004); § 609.05 (2004) (aiding); Count II—felony murder while committing kidnapping, in violation of Minn.Stat. § 609.185(a)(3) (2004); § 609.05; and Count III—felony murder while committing aggravated robbery, in violation of Minn.Stat. § 609.185(a)(3); § 609.05. The jury found Pendleton guilty of counts one and two, premeditated murder and felony murder while committing kidnapping, and acquitted him of count three. The district court sentenced Pendleton to life imprisonment without the possibility of parole for felony murder while committing kidnapping.

Pendleton asks us to reverse his conviction for several alleged errors by the district court: (1) overruling Pendleton's *Batson* objection, (2) admitting two of Pendleton's past convictions for impeachment purposes, and (3) erroneously instructing the jury on the felony murder while committing kidnapping count. We examine each issue in turn.

I.

■ Pendleton first argues that the district court committed error during jury selection, when it overruled his *Batson* objection to the state's peremptory challenge to prospective juror 34, a Hispanic woman. The use of peremptory challenges to exclude potential jurors is subject to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). A peremptory challenge against a prospective juror on account of her race denies equal protection both to the prospective juror, because it denies her the right to participate in jury service, and to the defendant, because it violates his right to be tried by a jury made up of members selected by nondiscriminatory criteria. *State v. Reiners*, 664 N.W.2d 826, 831 (Minn.2003). The United States Supreme Court established a three-step framework for determining whether a peremptory challenge is motivated by racial discrimination.[3] *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712. We have used the following summary of that framework:

[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the

_____

3. The *Batson* framework also appears in Minn. R.Crim. P. 26.02, subd. 6a(3).

proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.

*State v. Blanche,* 696 N.W.2d 351, 364–65 (Minn.2005) (quoting *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).

We give great deference to the district court's ruling on a *Batson* challenge, recognizing that the record may not reflect all of the relevant circumstances that the court may consider. *State v. White,* 684 N.W.2d 500, 506 (Minn.2004); *State v. Taylor,* 650 N.W.2d 190, 200–01 (Minn.2002). "The district court's determination will not be reversed unless it is clearly erroneous." *Taylor,* 650 N.W.2d at 201.

After objecting, Pendleton articulated two reasons why he believed the challenge to prospective juror 34 raised an inference of racial discrimination. First, he noted that the prospective juror was the first prospective juror of a minority race to be questioned, and he was concerned with the lack of "ethnic balance" in the jury pool. Second, Pendleton cited an incident the prospective juror had with the Willmar police, which was discussed in some detail during voir dire.

In response to a question from the state seeking information about any negative experiences with police officers, the prospective juror recounted a 3–month-old incident. After the prospective juror picked up her two sons and their friend from work late on a Friday night, the Willmar police stopped her car. The prospective juror insisted that she had done nothing wrong, but an officer removed her from the car and placed her in the back of a police vehicle. At least four officers and two police vehicles were involved in the stop. An officer accused the prospective juror of going to "party" and asked to search her car. The prospective juror granted permission. Her car was not searched during the 30–minute stop, and the officer told her at the conclusion of the stop that she had been speeding and would only be warned. The prospective juror speculated that she had been stopped because she and the children were all dressed in black and the children wore black berets, and the police persisted because one of her sons had a tattoo on his hand.

The district court did not immediately rule whether Pendleton established a prima facie showing of racial discrimination but instead allowed the state to respond. The state articulated three reasons for challenging prospective juror 34.

First, the state discussed the prospective juror's attitude toward plea agreements. The prospective juror stated that she thought plea agreements were wrong because people committing crimes get off easier than they should. She also stated that a witness testifying after receiving a plea agreement should be treated the same as others and not be given a deal. The state argued that its main witness was testifying pursuant to a plea agreement, raising the concern that the prospective juror might not accept the testimony of the witness based on her attitude toward plea agreements. The state also argued that nearly all of the potential jurors questioned were asked about plea agreements, and prospective juror 34 was the only one who expressed negative feelings toward them.

The state's second stated reason for its peremptory challenge was the prospective juror's response when Pendleton asked what she thought when someone says that

"they were just in the wrong place at the wrong time." The prospective juror responded that her son often said that and was usually correct. This attitude concerned the state because it believed that "the crux" of Pendleton's defense would be the "wrong place, wrong time" argument. The state worried that the prospective juror would "particularly relate and sympathize to the defendant in that claim because of her experiences with her son."

The state's third reason for the challenge was the prospective juror's possible attitude toward police in general, following her negative encounter with the Willmar police. When asked how the experience might affect her opinion toward police testimony during trial, she responded that it might be hard because she might think back to her experience. She also stated that she understood not all police are like those who pulled her over, and she said that she could be a fair juror, despite the experience. Based on this testimony, the state argued that the prospective juror was equivocal in how her experience might affect her perception of police who testified in the case, which provided the third reason for the challenge.

The district court then allowed Pendleton to respond. Pendleton cited the lack of ethnic diversity on the jury panel. Pendleton also rebutted each of the state's three reasons. In response to the state's "wrong place, wrong time" reason, Pendleton noted that the prospective juror investigated whether her son was telling the truth, which is a sign that as a juror, she would weigh the evidence. In response to the plea agreement reason, Pendleton argued that the state will benefit from a juror who believes people should be punished according to their actions, at least in

terms of how the juror might view the defendant's alleged actions. In response to the Willmar police stop and the prospective juror's attitude toward police, Pendleton noted that the prospective juror acknowledged that not all police are the same.

The district court overruled Pendleton's *Batson* objection, concluding that a prima facie case had not been shown. The court noted that the state had consistently questioned jurors about plea agreements, and prospective juror 34 was the only juror "adamant about plea bargains being bad." The court determined that the challenge was consistent with the state's desire for jurors who would look favorably on the state's key witness, who would testify pursuant to a plea agreement. The court concluded that even if a prima facie case had been made, the prospective juror's negative attitude toward plea agreements was a race-neutral reason for a challenge.[4]

■ We first observe that the district court improperly conducted the *Batson* analysis. "The importance of clarity at each step of the analysis is that the opponent has the burden of proving a prima facie case, the proponent has the burden of production of a race-neutral explanation, and the opponent has the ultimate burden of proving pretext and discriminatory intent." *Reiners*, 664 N.W.2d at 832. After Pendleton gave reasons for the objection, the district court should have determined whether a prima facie case of racial discrimination had been shown. *See White*, 684 N.W.2d at 505. Instead, the court allowed the state to respond and Pendleton to rebut that response. The court's analysis was not in accordance with our *Batson* precedent or the *Batson* procedure set

---

**4.** The district court also cited prospective juror 34's interest in police and courtroom dramas as a race-neutral reason for the state's challenge, but since the state did not offer this reason in support of its challenge, it does not factor into our analysis.

forth in Minn. R.Crim. P. 26.02, subd. 6a(3).

■ But we have not reversed a district court's *Batson* ruling solely because of its failure to follow the prescribed procedure. *See Reiners,* 664 N.W.2d at 832–34 (holding that the district court's application of *Batson* was clearly erroneous but then reviewing the record to make our own determination as to the validity of the objection); *Taylor,* 650 N.W.2d at 202 ("Because the district court did not apply the proper *Batson* analysis at step two, we need not defer to the [district court's] finding that the reasons were not facially race-neutral."). In *State v. Stewart,* we concluded that "while the trial court's duty to rule on the [*Batson* ] challenge is important, a new trial is not automatic where the court fails to rule explicitly." 514 N.W.2d 559, 563 (Minn.1994). As we held in Taylor, where the district court erred in applying *Batson,* we will examine the record without deferring to the district court's analysis. 650 N.W.2d at 202.

■ We first determine whether Pendleton made out a prima facie case of racial discrimination. The opponent of a peremptory challenge establishes a prima facie case under *Batson* by showing "(1) that a member of a protected racial group has been peremptorily excluded from the jury and (2) that circumstances of the case raise an inference that the exclusion was based on race." *Blanche,* 696 N.W.2d at 365. Pendleton argued at trial that prospective juror 34 was the only member of a racial minority questioned in the jury pool. The state's use of a peremptory challenge to remove a member of a racial minority, alone, does not establish a prima facie case. *Reiners,* 664 N.W.2d at 831. But Pendleton also argued during voir dire that the prospective juror's negative encounter with the Willmar police during the 30–minute long traffic stop should be con-

sidered. On appeal, Pendleton argues that the traffic stop was "apparently racially-motivated" and the peremptory strike by the state "assumed that a person subjected to racism is going to have a grudge against the police, and take it out on the State." We believe these facts raise an inference that the challenge was based on racial factors and conclude that Pendleton did make a prima facie showing.

■ In step two, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation." *Blanche,* 696 N.W.2d at 364 (quoting *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769). Race-neutral explanations do not have to be " 'persuasive, or even plausible.' " *Reiners,* 664 N.W.2d at 832 (quoting *Purkett,* 514 U.S. at 767–68, 115 S.Ct. 1769). Rather, the explanation will be deemed race-neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. The state argued that the prospective juror had negative feelings toward plea agreements, was sympathetic toward the defense's theory of "wrong place, wrong time," and was equivocal in how she might view police witnesses after her negative experience with the Willmar police. There is no discriminatory intent inherent in the explanations, and therefore we conclude that the state met its burden of production.

In step three of the *Batson* analysis, we must decide whether the opponent of the challenge has proved purposeful discrimination. *Blanche,* 696 N.W.2d at 364–65. In so doing, we "determine[ ] whether the defendant carried his burden of proving that the peremptory strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive." *Taylor,* 650 N.W.2d at 202. In our review of the record, we observe that despite Pendleton's

argument on appeal that the district court never reached step three,[5] the court did engage in the type of analysis this step requires. If the district court had properly articulated each step of the *Batson* analysis, the court would not have scrutinized the merits of the state's race-neutral explanations until step three. As previously discussed, before overruling Pendleton's objection, the district court analyzed the state's explanation regarding plea agreements. We conclude that the district court engaged in all three steps of the *Batson* analysis. By allowing Pendleton to state his reasons for the objection (step one), allowing the state to offer race-neutral reasons for the challenge (step two), and allowing Pendleton to rebut those reasons before ruling on the merits of the objection (step three), the district court collapsed the *Batson* analysis into one step.

■ While we do not defer to the district court's analysis, we conclude that the court properly overruled Pendleton's objection. Pendleton failed to carry his ultimate burden of proving that the state's peremptory challenge was motivated by racial discrimination. The state believed it was critical that selected jurors harbor no prejudice toward a witness testifying pursuant to a plea agreement. The state demonstrated this belief by questioning most jurors about their reactions toward plea agreements. Prospective juror 34 was the only potential juror to express negative feelings. The state's use of prospective juror 34's objections to plea agreements as a reason for a peremptory challenge is not a pretext for discrimination.

■ The state also expressed concern over the prospective juror's attitude toward Pendleton's "wrong place, wrong time" defense theory. A review of the record shows that the prospective juror was sympathetic to this theory, as a result of her experiences with her son. Peremptory challenges may be exercised for any reason, other than for purposes of impermissible discrimination. *See Batson*, 476 U.S. at 89, 106 S.Ct. 1712 ("[A] prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried * * *.") (internal quotation marks omitted). The state's decision to challenge jurors that it believed were sympathetic to the defendant's case is a permissible use of its challenges.

■ Finally, we are not persuaded that the state's reference to the prospective juror's equivocal feeling toward police, as a result of her negative encounter with the Willmar police, is evidence that the state racially discriminated against the prospective juror by exercising a peremptory challenge. Almost every prospective juror was questioned about his or her attitude toward police, demonstrating that the state's concern about possible bias against police extended to more than this prospective juror. Moreover, prospective juror 34 never stated that she thought her encounter with the Willmar police was due to race, but rather because she was dressed

---

5. Pendleton cites our decision in *State v. McRae*, 494 N.W.2d 252 (Minn.1992), to support the proposition that the district court has a duty to address step three of the *Batson* analysis. Although Pendleton is correct that the district court in *McRae* committed error by failing to properly address step three, *id.* at 257–58, we reversed the conviction and re-

manded for a new trial not because of the district court's error, but because the record was insufficient for us to make a determination of whether or not the prosecutor had a facially race-neutral reason for the challenge. *Id.* at 260. In contrast with *McRae*, the record here is sufficient for us to determine whether there has been a *Batson* violation.

in black and her sons wore black berets. Even if we were to agree with Pendleton's argument on appeal that racism should be inferred from the traffic stop, we do not reach the conclusion that the state had a racially discriminatory intent in challenging prospective juror 34, particularly in light of the state's other valid, race-neutral reasons.

Although the district court did not follow the prescribed procedure for conducting the *Batson* analysis, we hold that the court did not commit clear error in overruling Pendleton's objection to the state's peremptory challenge of prospective juror 34.

## II.

■ Next, Pendleton argues that the district court abused its discretion by admitting evidence of two past felony criminal convictions for impeachment purposes. The court admitted evidence of a conviction for fleeing a peace officer, to which Pendleton pleaded guilty in June 2000, and a conviction for making terroristic threats, to which Pendleton pleaded guilty in July 2000. The facts underlying these convictions were not referred to during trial. Pendleton argues the prejudicial effect of these convictions outweighed their probative value.

■ "A district court's ruling on the admissibility of prior convictions for impeachment of a defendant is reviewed under a clear abuse of discretion standard." *State v. Swanson,* 707 N.W.2d 645, 654 (Minn.2006). The district court must determine whether "the probative value of admitting this evidence outweighs its prejudicial effect." Minn. R. Evid. 609(a). In making its determination, the court examines the following factors:

(1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*State v. Jones,* 271 N.W.2d 534, 538 (Minn. 1978). Convictions over 10 years old are ordinarily inadmissible. Minn. R. Evid. 609(b).

The district court made explicit findings on the record as to the *Jones* factors in admitting the two convictions. *See Swanson,* 707 N.W.2d at 654 (" '[T]he trial judge should make explicit findings on the record as to the factors considered and the reasons for admitting or excluding the evidence.' ") (quoting Minn. R. Evid. 609(a) comm. cmt.—1989). The court found that the impeachment value of the crimes was strong because the crimes were recent, were within a short time of one another, and would "assist the jury in getting a picture of the whole person." We have stated that prior crimes are important to the jury's judgment of a witness's credibility, because it can then see the "whole person." *State v. Gassler,* 505 N.W.2d 62, 67 (Minn.1993).

Regarding the second factor, the dates of conviction, the district court reiterated that the crimes were relatively recent and close together in time. We have held that where convictions show a pattern of lawlessness and are less than 10 years old, the dates of conviction do not weigh against admission. *Swanson,* 707 N.W.2d at 655.

■ Regarding the third factor, the similarity of the past crimes to the charged crime, the district court found that the past crimes were dissimilar, creating no risk that the jury would view the charged crime as the same as past crimes. The concern weighing against admission with this factor is that the jury will use the

convictions as substantive evidence, in addition to impeachment evidence. *State v. Bettin,* 295 N.W.2d 542, 546 (Minn.1980). But the court instructed the jury that it could not consider evidence of past convictions as evidence of guilt for the crime charged. We have held that such an instruction protects the defendant from the concern that the jury will use his past convictions as substantive evidence. *State v. Brouillette,* 286 N.W.2d 702, 708 (Minn. 1979).

■ Regarding the fourth factor, the importance of the defendant's testimony, the district court determined that since Pendleton's prior testimony to the grand jury and statements to police would likely be admissible even absent his testimony at trial, credibility was an issue, and the convictions should be admitted. In weighing the last factor, the centrality of credibility, the court found that Pendleton's credibility weighed heavily on what role, if any, he played in the events. "If credibility is a central issue in the case, the fourth and fifth *Jones* factors weigh in favor of admission of the prior convictions." *Swanson,* 707 N.W.2d at 655. Credibility was critical, as Pendleton's "wrong place, wrong time" defense contradicts the consistent story of the state's witnesses, his DNA on the shirt found near the crime scene, his mention of the murder and surrounding events to Fischer and Larsen–Matray, and his inconsistent story in his statement to police.

Therefore, we hold that the district court did not clearly abuse its discretion by admitting Pendleton's two prior convictions at issue.

6. Minnesota Statutes § 609.185 provides:

   (a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
   * * * *
   (3) causes the death of a human being with intent to effect the death of the person

## III.

Pendleton's final argument is that the district court committed prejudicial error in its instruction to the jury on Count II. In that count, Pendleton was charged with violating Minn.Stat. § 609.185(a)(3) (2004) (felony murder while committing kidnapping);[6] § 609.05 (2004) (aiding).[7] In its instruction to the jury on the elements of the crime, the district court defined the underlying felony of kidnapping as follows:

The defendant or another aided by the defendant removed Robert Frederick Berry, Jr., from one place to another without his consent. To remove a person from one place to another is to cause the person to move from one place where the person was to another place;

The defendant or another aided by the defendant acted for the purpose of committing great bodily harm on the person of Robert Berry, Jr., or the defendant or another aided by the defendant acted for the purpose of facilitating the commission of the crime of murder, or facilitating flight after the crime of assault in the third degree.

The district court's instructions on kidnapping, as they relate to Pendleton's case, closely track CRIMJIG 15.02. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 15.02 (4th ed.1999). The instructions also reflect the legislature's definition of kidnapping:

Whoever, for any of the following purposes, confines or removes from one

or another, while committing or attempting to commit * * * kidnapping * * *[.]

7. "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1.

place to another, any person without the person's consent * * * is guilty of kidnapping and may be sentenced as provided in subdivision 2:

&ast; &ast; &ast; &ast;

(2) to facilitate commission of any felony or flight thereafter; or

(3) to commit great bodily harm or to terrorize the victim or another[.]

Minn.Stat. § 609.25, subd. 1 (2004). The court instructed the jury that it could find that Pendleton committed kidnapping for any one of the three purposes in the instructions: (1) for the purpose of committing great bodily harm; (2) for the purpose of facilitating the commission of murder; or (3) for the purpose of facilitating flight after the crime of assault in the third degree.

■ Pendleton argues that the district court committed prejudicial error because it did not instruct the jury that it must unanimously find the purpose for which Pendleton acted. Under the court's instructions, the jury found Pendleton guilty of felony murder while committing kidnapping, but because the jury was not instructed that unanimity was required to find a purpose, Pendleton argues that he was denied the constitutional right to a unanimous verdict on each element of the crime.[8]

■ Pendleton did not object to the district court's instruction on felony murder while committing kidnapping at trial. A party is prohibited from " 'assign[ing] as error any portion of the charge or omission' unless the party objects to the instructions before they are given to the jury." *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn.2001) (quoting Minn. R.Crim. P. 26.03, subd. 18(3)). But we may consider plain error not brought to the district court's attention if the error affects substantial rights. Id.; Minn. R.Crim. P. 31.02. For plain error, we must find: (1) there is error; (2) the error is plain; and (3) the error affects the defendant's substantial rights. *Crowsbreast*, 629 N.W.2d at 437. If all three prongs are met, the error may only be corrected if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

■ Jury verdicts in all criminal cases must be unanimous. Minn. R.Crim. P. 26.01, subd. 1(5). To achieve that end, a

---

8. Pendleton also argues that under the plain language of section 609.25, each purpose for kidnapping listed is a separate element, so a jury must unanimously find the accused had one of the four listed purposes. We disagree. We interpret the enumerated purposes as alternatives to satisfying a single element of kidnapping. This interpretation is supported by an advisory committee comment made at the time the kidnapping statute was adopted in 1963: "Kidnapping consists of two basic elements: (1) the confinement or restraint of the person * * * and (2) the intent with which the imprisonment is accompanied." Minn. Stat. § 609.25 advisory comm. cmt.—1963. The statute has not been revised in any material way since 1963. *See* Act of May 17, 1963, ch. 753, § 609.25, 1963 Minn. Laws 1185, 1203.

Pendleton also cites *State v. Patch*, 329 N.W.2d 833 (Minn.1983), to support the proposition that each purpose under element two of the kidnapping statute is an actual element that requires jury unanimity. In *Patch*, the defendant was convicted of violating two of the statutory kidnapping purposes arising out of the same conduct. We vacated one of the convictions, thereby "bar[ring] the prosecutor from exaggerating the criminality of the defendant's conduct by obtaining two convictions for the same offense." *Id.* at 837. We did not discuss whether each purpose constituted a separate element, as Pendleton suggests; rather, we noted that the case law supported the vacation and the state conceded the issue. *Id.*

jury must "unanimously find[ ] that the government has proved each element of the offense." *State v. Ihle,* 640 N.W.2d 910, 918 (Minn.2002) (citing *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999)). But the jury does not have to unanimously agree on the facts underlying an element of a crime in all cases. In *Schad v. Arizona,* the United States Supreme Court addressed a district court's jury instructions, where the jury could find that the defendant either committed first-degree murder as a result of premeditation or committed first-degree murder in an attempt to commit robbery. 501 U.S. 624, 629, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The jury was not required to agree on one of those two mental states, so long as the jury unanimously agreed that the defendant committed first-degree murder. *Id.* A plurality of the court stated:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

*Id.* at 631–32, 111 S.Ct. 2491 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring)).[9] The plurality concluded that this rule applied not only to satisfying an *actus reus* element of an offense, but also to an element of *mens rea,* which was at issue in that case. *Id.* at 632, 111 S.Ct. 2491. But the plurality noted that due process may limit a legislature's "capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense"; for example, a legislature could not create a criminal offense with the generic label of "crime" and allow the jury to find that a defendant violated the offense by committing any range of conduct, from murder to littering. *Id.* at 632–33, 111 S.Ct. 2491.

The plurality defined the due process limits on a legislature's ability to define different courses of conduct or different states of mind as alternatives to a single element, by requiring that such alternatives comport with fundamental fairness and rationality. *Id.* at 637–38, 111 S.Ct. 2491. On the facts in *Schad,* the plurality determined that fundamental fairness and rationality were met if the two alternative mental states "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 643, 111 S.Ct. 2491. The plurality concluded that a moral equivalence between premeditated murder and felony murder while committing robbery "could reasonably be found." *Id.* at 644, 111 S.Ct. 2491.

We cited *Schad* with approval in *Crowsbreast,* where the district court did not require jurors to agree on specific predicate acts that comprised a "past pattern of domestic abuse" underlying a domestic abuse homicide conviction. 629 N.W.2d at 438–39. We concluded that the "grouping of past acts of domestic abuse as a preliminary factual element * * * is in no way an

---

**9.** Although *Schad* was decided by a four-member plurality, Justice Scalia agreed with "the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission," but he disagreed with the plurality's reasoning. 501 U.S. at 649, 111 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment).

irrational or unfair definition of domestic abuse homicide, nor are those acts so inherently separate as to present a due process issue as to jury unanimity." *Id.* at 439.

We note that for purposes of domestic abuse homicide, "domestic abuse" is broadly defined as an act committed against a family or household member that "constitutes a violation of [Minn.Stat. §§ ] 609.221, 609.222, 609.223, 609.224, 609.2242, 609.342, 609.343, 609.344, 609.345, 609.713, or any similar laws of the United States or any other state." Minn.Stat. § 609.185(c) (2004). The specifically named sections encompass first-, second-, third-, and fifth-degree assault, domestic assault, first through fourth-degree criminal sexual conduct, and terroristic threats. This definition allows the jury considerable latitude in finding a past pattern of domestic abuse. For example, some jurors could be convinced that a defendant displayed a replica firearm in an attempt to cause terror in a family member, in violation of Minn.Stat. § 609.713, subd. 3 (2004), while other jurors could find that the defendant inflicted great bodily harm on a family member, in violation of Minn.Stat. § 609.221, subd. 1 (2004). Both offenses contribute to finding a past pattern of domestic abuse, even though the jurors are not required to agree unanimously on which acts of abuse were committed for purposes of domestic abuse murder.

■■■ The three kidnapping purposes available to the jury to prove that Berry was murdered while being kidnapped are not so inherently distinct as to violate due process. The three underlying purposes of committing great bodily harm, committing murder, or facilitating flight after third-degree assault are no more divergent than the predicate acts that may make up domestic abuse murder. The legislature also chose to punish kidnapping similarly, regardless of which purpose is found underlying the commission of the crime. Minn.Stat. § 609.25, subd. 2 (2004).[10] While the legislature's determination of penalties is not dispositive, it lends credence to assigning similar blameworthiness or culpability among each purpose for kidnapping.

Two other states have relied on *Schad* in concluding that a defendant is not constitutionally entitled to a unanimous jury verdict on a single purpose for kidnapping, where the jury was instructed on more than one purpose. *See Kills on Top v. State*, 273 Mont. 32, 901 P.2d 1368, 1383–84 (1995); *State v. Avery*, 126 Ohio App.3d 36, 709 N.E.2d 875, 881–83 (1998). A third state has held that a defendant was not entitled to a unanimous jury verdict on the purpose for which he engaged in unlawful sexual contact. *State v. St. Pierre*, 693 A.2d 1137, 1139 (Me.1997).

Our courts have relied on *Schad* in concluding that jurors are not always required to agree on alternative ways in which a crime can be committed. *See Ihle*, 640 N.W.2d at 917–19 (holding that various statutory means of committing legal obstruction are not so dissimilar that jury is required to find one unanimously); *State v. Hart*, 477 N.W.2d 732, 737–39 (Minn.App. 1991) (holding that jury does not need to unanimously agree on the statutory circumstance that warrants first-degree sexual assault, but rather that the victim either

---

**10.** The statutory maximum penalty differs only by virtue of the final result of the kidnapping, based on whether the victim was released in a safe place without great bodily harm, which carries a lighter maximum sentence than if the victim was not released in a safe place, suffered great bodily harm, or was under the age of 16. Minn.Stat. § 609.25, subd. 2. The purpose for committing the kidnapping is irrelevant.

sustained a personal injury or had fear of harm), *rev. denied* (Minn. Nov. 26, 1991).

The jurors agreed that Pendleton had a kidnapping purpose and that the kidnapping led to Berry's murder. " '[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.' " *Schad,* 501 U.S. at 631–32, 111 S.Ct. 2491 (quoting *McKoy v. North Carolina,* 494 U.S. at 449, 110 S.Ct. 1227 (Blackmun, J., concurring)). The rule that jurors need not agree on the mode of commission of a crime "is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Id.* at 650, 111 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment). Pendleton has not established a due process violation as to jury unanimity.

We hold that the district court did not commit error in its jury instruction as it relates to felony murder while committing kidnapping. Because there is no error, there is no need to address steps two and three of the plain error analysis.

Affirmed.