*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0616**

State of Minnesota,
Respondent,

vs.

Jeffrey Scott Gunderson,
Appellant.

**Filed April 22, 2024**
**Affirmed**
**Gaïtas, Judge**

Becker County District Court
File No. 03-CR-21-2160

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Brian W. McDonald, Becker County Attorney, Detroit Lakes, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Greg Scanlan, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Frisch, Presiding Judge; Worke, Judge; and Gaïtas, Judge.

**NONPRECEDENTIAL OPINION**

**GAÏTAS**, Judge

Appellant Jeffrey Scott Gunderson challenges his conviction for threats of violence, arguing that the district court plainly erred by failing to instruct the jury that its verdict had to be unanimous as to the specific threat that Gunderson made when he told a corrections

agent that he was planning to commit a school shooting and was "ready to get into a shootout with law enforcement." Gunderson also raises additional issues in a pro se supplemental brief. Because Gunderson's threat to commit a school shooting constituted a single threat, and the district court instructed the jury that its verdict had to be unanimous, the district court did not plainly err in its jury instructions. And because Gunderson is not entitled to relief based on the arguments raised in his pro se supplemental brief, we affirm.

**FACTS**

In November 2021, Gunderson was released from prison. On the day of his release, he met with his supervising corrections agent, J.B. According to J.B., Gunderson stated during their meeting that he planned to purchase an AR-15 and then commit a school shooting. Gunderson also said that he planned to wear a bulletproof vest and would be prepared for a "shootout" with law enforcement. J.B. immediately called the police, and Gunderson was arrested. Respondent State of Minnesota charged Gunderson with one count of threats of violence. *See* Minn. Stat. § 609.713, subd. 1 (2020) (providing that a person who "threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another . . . , or in a reckless disregard of the risk of causing such terror or inconvenience" is guilty of threats of violence).

Gunderson requested a jury trial. At trial, the prosecutor called two witnesses: J.B. and the police officer who responded to J.B.'s report.

J.B. testified that Gunderson was released from prison on November 9, 2021, on "intensive supervised release" (ISR). As an ISR agent, J.B. was charged with supervising

2

Gunderson. J.B. was already familiar with Gunderson because he had previously served as Gunderson's ISR agent in 2019.

On November 9, J.B. met with Gunderson at Gunderson's mother's house in Detroit Lakes. The purpose of the meeting was to review the "conditions of supervised release, as well as the packet of ISR rules and expectations." According to J.B., Gunderson expressed his frustration with J.B., the department of corrections, and "the community in general." Gunderson "verbalized that he was feeling homicidal."

J.B. asked Gunderson if he planned to act on his homicidal feelings. According to J.B., Gunderson responded that he planned "to travel to Moorhead, Minnesota to the Runnings store," a sporting-goods store that sells firearms, to "purchase an AR-15." He told J.B. that he would "return back to Detroit Lakes and do a school shooting at Rossman Elementary School." According to J.B., Gunderson "indicated that he . . . planned on wearing a bulletproof vest for his safety[,] [and] verbalized that he had [no regard] for anybody's safety or well-being, . . . [and] that he was ready to get into a shootout with law enforcement."

J.B. testified that he did not believe Gunderson was joking and that Gunderson's remarks made him fear for his own safety and the community's safety. He took Gunderson's threat seriously because he knew that Gunderson had previously possessed "a replica firearm" (i.e., a BB gun), had previously "traveled to the Dilworth/Moorhead area" in violation of ISR conditions, and had previously said that he owned a bulletproof vest.

3

Following the meeting with Gunderson, J.B. returned to his car, activated Gunderson's GPS monitoring device, and put the device into the "pursuit mode," which provided a "more accurate update-to-date timeline of [Gunderson's] location." J.B. also called the Detroit Lakes police department to report Gunderson's threats.

According to J.B., he received two postcards from Gunderson after Gunderson's arrest. In both postcards, Gunderson asserted that he was entitled to own a bulletproof vest notwithstanding his ISR status.

The responding officer testified that she met with J.B., who advised her that Gunderson "had made some threats." During the officer's recorded interview with J.B.—which was played for the jury—J.B. detailed Gunderson's remarks about "plans to go to Runnings in Moorehead, purchase an AR-15 and then return back to Detroit Lakes to shoot up [Rossman[1]] Elementary School." The officer asked J.B., "What other comments did [Gunderson] make to you?" J.B. reported that Gunderson said he would "obtain a bulletproof vest, . . . wear it on him when he walked around town as he had no problems with getting in a shootout with law enforcement, essentially wanting to do suicide by cop." J.B. also relayed Gunderson's statements that he "did not care about his wellbeing or anybody else's wellbeing" and that "he was very angry with society in general." The

---

[1] On the recording, J.B. referred to the school as "Rothman Elementary School," rather than "Rossman," which is a school in Detroit Lakes. J.B. testified at trial that he was not from the Detroit Lakes area, and he was therefore unfamiliar with the local schools. But he explained to the jury that he took Gunderson's remarks seriously because he "knew there was a school [in the area] that started with an 'R.'"

officer told the jury that, given the nature of Gunderson's threat, she called her supervisor, who immediately arranged for Gunderson's arrest.

Gunderson testified in his own defense. He denied saying anything to J.B. about buying an AR-15 or committing a school shooting. Although he admitted that he told J.B. he wanted a bulletproof vest, it had nothing to do with a plan for a mass shooting. Gunderson testified that he was frustrated because there was a delay in his release from prison and he blamed J.B. for that delay.

In its final instructions to the jury, the district court provided a general unanimity instruction, which stated that "to return a verdict, whether guilty or not guilty, each juror must agree with that verdict" and "[the jury's] verdict must be unanimous." Gunderson did not request any other instruction regarding jury unanimity.

The jury found Gunderson guilty of the charged offense of threats of violence. At sentencing, the district court imposed a sentence of 36 months in prison, which was at the top of the presumptive range under the sentencing guidelines.

Gunderson appeals.

## DECISION

### I. The district court did not plainly err in its instructions to the jury regarding the requirement for juror unanimity.

Gunderson argues that he is entitled to a new trial because the district court erred by failing to provide a specific-unanimity jury instruction. He contends that under the circumstances of his case, the district court should have instructed the jury that each juror had to agree regarding which specific statement—among all of the statements that J.B.

alleged—constituted a threat. Although Gunderson acknowledges that he did not request a specific-unanimity instruction, he asserts that the district court's failure to provide one was plain error that prejudiced his substantial rights.

"Jury verdicts in all criminal cases must be unanimous." *State v. Pendleton*, 725 N.W.2d 717, 730 (Minn. 2007) (citing Minn. R. Crim. P. 26.01, subd. 1(5)). To that end, a jury must unanimously agree that the state proved each element of the offense beyond a reasonable doubt. *Id.* at 730-31. However, a jury need not unanimously agree on the facts underlying each element of an offense if different facts show "equivalent blameworthiness or culpability." *Id.* at 731; *see also State v. Hager*, 727 N.W.2d 668, 674 (Minn. App. 2007). A jury, therefore, must unanimously agree on which acts a defendant committed if different acts could satisfy a single element, but unanimity is not required as to the "alternative means or ways in which the crime can be committed." *State v. Stempf*, 627 N.W.2d 352, 354-55 (Minn. App. 2001) (quotation omitted). District courts are generally given "considerable latitude in selecting language used in the jury charge and determining the propriety of a specific instruction," *Morlock v. St. Paul Guardian Ins. Co.*, 650 N.W.2d 154, 159 (Minn. 2002), but jury instructions that allow for the possibility of significant disagreement among jury members as to the specific act committed violates a defendant's right to a unanimous verdict, *Stempf*, 627 N.W.2d at 354.

To find a defendant guilty of the offense of threats of violence under Minnesota Statutes section 609.713, subdivision 1, a jury must unanimously agree that the defendant "threaten[ed], directly or indirectly, to commit any crime of violence with purpose to terrorize another or . . . in a reckless disregard of the risk of causing such terror."

6

Subdivision 1 defines "crime of violence" as any "violent crime" listed in Minnesota Statutes section 609.1095, subdivision 1(d) (2020).

At trial, the prosecutor alleged that Gunderson threatened to commit second-degree assault. *See* Minn. Stat. § 609.222, subd. 1 (2020). But Gunderson claims that the evidence showed that he made *two* separate threats to commit two separate second-degree assaults— a threat to commit a school shooting and a threat to have a "shootout" with police. Accordingly, Gunderson argues, the district court should have instructed the jury that unanimity was required as to the specific statement that constituted a threat of violence.

Because Gunderson did not request such an instruction at trial, we apply the plain-error standard of review. *See State v. Myhre*, 875 N.W.2d 799, 804 (Minn. 2016) (stating that appellate courts review unobjected-to errors using the "plain error test"). "In order to meet the plain error standard, a criminal defendant must show that (1) there was an error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *Id.* (citing *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998)). "An error is plain if it is 'clear' or 'obvious,' which is typically established 'if the error contravenes case law, a rule, or a standard of conduct.'" *State v. Webster*, 894 N.W.2d 782, 787 (Minn. 2017) (quoting *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006)). If a defendant satisfies the first three elements of the plain-error standard, a reviewing court will only exercise its discretion to grant relief when the "failure to do so will cause the public to seriously question the fairness and integrity of our judicial system." *Pulczinski v. State*, 972 N.W.2d 347, 359 (Minn. 2022).

For two reasons, we discern no error in the district court's failure to provide a specific-unanimity instruction.

First, at trial, the attorneys for both parties agreed that the sole threat at issue was Gunderson's threat to commit a school shooting. The prosecutor repeated Gunderson's remarks about his plan to commit a school shooting at the beginning of both opening statement and closing argument: "Go to Runnings in Moorhead, buy an AR-15, return to Detroit Lakes and shoot up Rossman Elementary." And Gunderson's counsel told the jury during closing argument that "[t]he nature of the threat is a school shooting." Moreover, the prosecutor did not even mention Gunderson's remarks about a bulletproof vest or a shootout with police during opening statement, closing argument, or rebuttal closing argument. Because both parties understood that the threat at issue was Gunderson's threat to commit a school shooting—and the attorneys clearly conveyed that understanding to the jury—it is improbable that the jurors were confused about the threat that was the basis for the charge.

Gunderson argues that we should not consider the statements of attorneys in determining whether a specific-unanimity instruction was required, observing that attorney statements are not evidence. *See State v. McCoy*, 682 N.W.2d 153, 158 (Minn. 2004) ("[T]he questions and arguments of attorneys are not evidence." (quotation omitted)). However, we have previously held that the remarks of attorneys are a relevant consideration in deciding whether a specific-unanimity instruction was required. *See Stempf*, 627 N.W.2d at 358 (concluding that a specific-unanimity instruction was necessary, in part, because the state told the jury during closing arguments that either of

8

two alleged acts of drug possession could satisfy the possession element of the charged crime).

Second, the trial evidence supports just one prosecution theory—that the threat of violence was Gunderson's threat to commit a school shooting. The state alleged that the threat occurred during one conversation with one person. And although Gunderson made multiple statements about how he planned to commit a school shooting, all of those statements—including his statement about wearing a bulletproof vest for a shootout with police—related to his threat to commit a school shooting.

In this regard, the circumstances here differ from those in the nonprecedential case that Gunderson relies on in his brief, *State v. Thompson*, No. A16-0097, 2017 WL 389939 (Minn. App. Jan. 17, 2017).[2] The defendant in that case, who was charged with one count of threats of violence, made two distinct threatening social media posts that were separated by about seven hours and concerned one individual. *Id.* at *1. And there, the prosecutor argued to the jury that "each post was a separate threat to commit a crime of violence." *Id.* at *5. Given the evidence and prosecution theory in *Thompson*, we determined that a specific-unanimity instruction was required. *Id.*

Here, by contrast, the state's evidence and theory left no room for juror confusion. *See Stempf*, 627 N.W.2d at 354. The state alleged that Gunderson threatened to commit a school shooting, which was a threat to commit a crime of violence. Under these circumstances, the district court had no obligation to provide the jury with a specific-

---

[2] We note that nonprecedential decisions are not binding but may be considered for their persuasive value. Minn. R. Civ. App. P. 136.012, subd. 1(c).

9

unanimity instruction. We therefore conclude that the district court did not plainly err in failing to give such an instruction.

## II. The issues raised in Gunderson's pro se supplemental brief do not warrant relief.

Gunderson raises additional arguments in a pro se supplemental brief. Most of those arguments are challenges to J.B.'s testimony.

Gunderson contends that J.B.'s testimony that he was aware of Gunderson's past "incidents of violence" was inadmissible and prejudicial. However, the district court did not admit that testimony—it sustained an objection to the testimony and instructed the jury not to consider it. Because we "assume that the jury followed the court's instructions and properly considered the evidence," we reject Gunderson's claim that J.B.'s reference to prior incidents requires reversal. *State v. Vang*, 774 N.W.2d 566, 578 (Minn. 2009).

Gunderson also challenges numerous statements that J.B. made during his trial testimony, arguing these statements were either unreliable or untruthful. Yet the "assessment of witness credibility is a jury function." *State v. Reese*, 692 N.W.2d 736, 741 (Minn. 2005). It is not our role as the appellate court to second-guess the jury's credibility determinations. *See State v. Watkins*, 650 N.W.2d 738, 741 (Minn. App. 2002) ("We defer to the fact-finder on determinations of credibility.").

Apart from the challenges to J.B.'s testimony, Gunderson's pro se supplemental brief argues that: (1) the jury instructions were erroneous; (2) the presentence investigation report contained statements he did not make; (3) because the elementary school was unaware of the threat, there was no victim, and thus, no crime; and (4) the jury was biased

10

because one juror was a past victim of Gunderson's check fraud. We conclude that Gunderson is not entitled to relief on these claims because his pro se supplemental brief does not support them with argument, citations to the relevant portions of the record, or citations to legal authority. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) (declining to consider pro se claims on appeal that are not supported "by either arguments or citations to legal authority").

**Affirmed.**