STATE of Minnesota, Respondent,

v.

**Val Derick DIGGINS, Appellant.**

No. A08–1143.

Supreme Court of Minnesota.

Aug. 28, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Zachary A. Longsdorf, Longsdorf Law Firm, P.L.C., Lake Elmo, Minnesota, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Val Derick Diggins was found guilty by a Hennepin County jury of two counts of first-degree premeditated murder and two counts of first-degree felony murder arising out of the shooting deaths of Charles Woods–Wilson and Ira Brown, and three counts of first-degree aggravated robbery involving three other victims. The district court entered judgment of conviction and imposed sentence. On appeal, Diggins argues that the court erred by: (1) overruling his *Batson* objection to the State's peremptory challenge of an African–American prospective juror, and (2) admitting evidence that he assaulted and threatened a witness two days before trial. Because we conclude that the court did not err, we affirm Diggins' convictions. We also deny Diggins' motion for supplemental briefing.

In the early morning hours of October 31, 2007, police responded to a 911 call of shots fired in a north Minneapolis residence. The first police officer at the scene spotted two women, K.C. and L.E., on the roof of the house screaming hysterically for help. When officers entered the house, they discovered the bodies of Charles Woods–Wilson, who had been shot in the head, and Ira Brown, who had been shot multiple times in the back. Both men died from their gunshot wounds.

K.C. and L.E. told investigators that they, along with A.A. and Woods–Wilson, met Brown at his house that evening. During the evening, numerous individuals stopped by the house to purchase crack cocaine, including a man known as "Pops." Around 2:30 a.m., L.E. and Woods–Wilson had fallen asleep in the living room and Brown went upstairs. K.C. and A.A. were in the kitchen when they heard a knock at the back door. Pops entered, pulled out a handgun, and robbed them. Pops then

headed into the living room and robbed L.E. and Woods–Wilson. After Pops took what they had, he walked up to Woods–Wilson and said: "You should have never f* * *ed with a ni* * *r like me, a stone ass ni* * *r like me." Pops put the gun to Woods–Wilson's head and pulled the trigger.

Hearing the shot, Brown ran downstairs and struggled with Pops to get the gun. During the struggle, Brown was shot and ran into the bedroom. As he did so, Pops shot him three times in the back. A.A. heard the gunshots and fled to a friend's house to contact police. K.C. and L.E. fled upstairs and climbed onto the roof where they called 911. K.C., L.E., and A.A. described Pops to investigators as an African–American male, 40 to 50 years of age, with a gray beard, and wearing blue mechanic's coveralls.

S.H. told investigators that he witnessed two conversations that evening involving a man nicknamed "Mo." Several hours before the shooting, S.H. was in an abandoned apartment building when he overheard a man offer Mo money and drugs if Mo would "take care of two people." A few hours later, S.H. heard Mo threatening Woods–Wilson. When S.H. learned the next day that Woods–Wilson had been killed, he told police he thought Mo was responsible and gave them Mo's address. Investigators determined that the address was the residence of Diggins.

Investigators assembled a photographic lineup of six individuals, including Diggins, and showed it to S.H. S.H. identified Diggins as the man he knew as Mo. Investigators also showed the photo lineup to K.C., L.E., and A.A., all three of whom identified Diggins as Pops, the shooter. Diggins was later apprehended by police as he was trying to escape from a duplex in north Minneapolis. At the time of his arrest, Diggins was wearing mechanic's coveralls and carrying Woods–Wilson's driver's license in his pocket.

A Hennepin County grand jury indicted Diggins with two counts of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2012); two counts of first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2012); and three counts of first-degree aggravated robbery, Minn. Stat. § 609.245, subd. 1 (2012). Diggins pleaded not guilty, and the case proceeded to trial.

During jury selection, the State exercised a peremptory challenge against an African–American prospective juror, Juror 16. Diggins objected to the challenge under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), arguing that the State sought to strike Juror 16 because of the juror's race. The district court overruled Diggins' objection, sustained the State's peremptory challenge, and excused Juror 16 from the jury panel.

At trial, the State presented evidence consistent with its investigation. Further, K.C., L.E., and A.A. testified that the mechanic's coveralls they saw the shooter wearing matched the coveralls Diggins wore when he was arrested. Additionally, S.H. testified over Diggins' objection that Diggins assaulted and threatened him in a jail holding cell two days before trial. S.H. was being held in the Hennepin County jail for trespass and assault charges and was mistakenly placed in the same holding cell as Diggins. Diggins confronted S.H. and assaulted him. One officer testified that Diggins punched S.H. and "slamm[ed] his head violently into the bench." Another officer testified that as Diggins was led away, he threatened S.H., saying: "[T]hat will teach you to snitch." S.H. sustained a fractured eye socket and cheekbone, lost consciousness, and was taken to the hospital.

Diggins testified at trial and denied any involvement in the murders. Diggins admitted that he visited Brown's house three times on the night of the shooting to purchase crack cocaine. According to Diggins, he noticed Woods–Wilson's driver's license on the ground as he left the house the third time and decided to pick it up and return it at a later date. Diggins denied that he returned to the house a fourth time, that he shot and killed Woods–Wilson and Brown, and that he robbed the three others. Diggins also admitted that he struck S.H. in the holding cell two days before trial, but denied that he threatened him.

Following trial, the jury found Diggins guilty on all counts. The district court entered judgment of conviction and sentenced Diggins to two consecutive terms of life imprisonment without parole for first-degree premeditated murder and three concurrent terms of 111 months imprisonment for aggravated robbery. This direct appeal followed.[1]

## I.

Diggins first argues that the district court erred by overruling his *Batson* objection to the State's peremptory challenge of Juror 16. According to Diggins, the State's peremptory challenge was racially motivated and its proffered explanations for exercising the challenge were pretextual.

Generally, each party has a limited number of peremptory challenges in a jury trial. *See* Minn. R.Crim. P. 26.02, subd. 6. Unlike a challenge for cause, a peremptory challenge allows a party to strike a prospective juror without having

to explain the reason for the strike. *Id.* The Equal Protection Clause of the Fourteenth Amendment, however, prohibits purposeful racial discrimination in jury selection, and in particular prohibits the State from using a peremptory challenge to strike a prospective juror on the basis of the juror's race. U.S. Const. amend. XIV; *Miller–El v. Dretke*, 545 U.S. 231, 238, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. The three-step *Batson* analysis determines whether the exercise of a peremptory challenge was motivated by racial discrimination. *State v. Martin*, 773 N.W.2d 89, 101 (Minn.2009); *see also* Minn. R.Crim. P. 26.02, subd. 7(3).

First, the defendant must make a "prima facie showing" that the State exercised its peremptory challenge against a prospective juror on the basis of race. *Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712); *see also* Minn. R.Crim. P. 26.02, subd. 7(3)(a). To make such a showing, the defendant must establish that "one or more members of a racial group have been peremptorily excluded from a jury" and that the "circumstances of the case raise an inference that the exclusion was based on race." *Martin*, 773 N.W.2d at 101 (citations omitted) (internal quotation marks omitted).

Second, once the defendant makes a prima facie showing, the burden shifts to the State to "articulate a race-neutral explanation" for exercising the peremptory challenge. *Hernandez*, 500 U.S. at 358–59, 111 S.Ct. 1859 (citing *Bat-*

---

1. Diggins filed this direct appeal in July 2008, but subsequently obtained a stay of his appeal so that he could petition the district court for a postconviction evidentiary hearing to pursue an ineffective-assistance-of-trial-counsel claim. In November 2012, Diggins withdrew his postconviction petition, and we vacated the stay and scheduled the direct appeal for oral argument.

*son*, 476 U.S. at 97–98, 106 S.Ct. 1712); *see also* Minn. R.Crim. P. 26.02, subd. 7(3)(b). The explanation need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered [is] deemed race neutral." *Id.* at 768, 115 S.Ct. 1769 (citation omitted) (internal quotation marks omitted).

▇▇▇ Third, if the State articulates a race-neutral explanation, the district court must determine whether the defendant has "carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859 (citing *Batson*, 476 U.S. at 98, 106 S.Ct. 1712); *see also* Minn. R.Crim. P. 26.02, subd. 7(3)(c). Specifically, the court must determine whether the defendant has shown that the peremptory challenge was "motivated by racial discrimination" and that the State's proffered explanation was "merely a pretext for the discriminatory motive." *State v. Pendleton*, 725 N.W.2d 717, 726 (Minn.2007) (citation omitted) (internal quotation marks omitted). The defendant ultimately carries the burden of persuasion to demonstrate the existence of purposeful discrimination; this burden never shifts from the opponent of the peremptory challenge. *See State v. Reiners*, 664 N.W.2d 826, 832 (Minn.2003).

▇▇▇ Because the existence of racial discrimination in the use of a peremptory challenge is a factual determination, we give "great deference" to the district court's ruling and will uphold the ruling unless it is clearly erroneous. *Martin*, 773 N.W.2d at 101 (citing *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)). This deference is warranted because the district court occupies a unique position to observe the demeanor of the prospective juror and

evaluate the credibility of the party that exercised the peremptory challenge, and the "record may not reflect all of the relevant circumstances that the court may consider." *Pendleton*, 725 N.W.2d at 724.

With these principles in mind, we analyze whether the district court erred by overruling Diggins' *Batson* objection. Juror 16, who is African American, was the second African–American prospective juror examined. When the State finished its questioning of Juror 16, it exercised a peremptory challenge against the juror. In response, Diggins objected under *Batson*, arguing that the State's peremptory challenge was made on the basis of Juror 16's race. Specifically, Diggins argued that the State had accepted other white jurors, but rejected Juror 16 because he was African American.

The district court took a break to review the law, and then engaged in a lengthy colloquy with counsel regarding each step of the *Batson* analysis. The court concluded that Diggins failed to make a prima facie showing that the State's peremptory challenge was racially motivated. The court reasoned that Juror 4, who is African American, had not been challenged by the State and already sat on the jury. The court then asked the State to articulate its reasons for exercising the peremptory challenge. The State explained that it sought to strike Juror 16 because it was concerned about inconsistencies between the juror's answers on the questionnaire and responses in voir dire, and his "intellectual capacity" to serve as a juror. The court concluded that the State had articulated race-neutral explanations for exercising the peremptory challenge, noting that the State's reasons "aren't really big, huge in and of themselves, but ... collectively support the race neutral explanation." Thereafter, the court invited Diggins to rebut the State's proffered explanations as

pretextual. But Diggins declined to do so. Consequently, the court overruled Diggins' *Batson* objection, sustained the State's peremptory challenge, and excused Juror 16.

■ Diggins acknowledges that the district court concluded that he failed to make a prima facie showing at step one of the *Batson* analysis, but contends that issue is moot because the district court proceeded to address steps two and three. *See State v. Gaitan*, 536 N.W.2d 11, 15 (Minn.1995) (suggesting that the preliminary issue of whether the defendant has made a prima facie showing "is moot" if the district court proceeds to the second step and rules on the ultimate question of purposeful discrimination). Generally, if the district court determines that the defendant failed to make a prima facie showing, it may overrule the *Batson* objection and need not proceed to address steps two and three of the *Batson* analysis. *See Purkett*, 514 U.S. at 767, 115 S.Ct. 1769 (stating that steps two and three of the *Batson* analysis are only reached if "the opponent of a peremptory challenge has made out a prima facie case of racial discrimination" at step one); *State v. White*, 684 N.W.2d 500, 505 (Minn.2004). Because the court proceeded to address steps two and three, we resolve this case under those steps. *See Reiners*, 664 N.W.2d at 831 (declining to address whether a prima facie showing had been made).

■ Turning to step two, we conclude that the State articulated race-neutral explanations to support its peremptory challenge of Juror 16. The State explained that several of Juror 16's answers on the questionnaire were inconsistent with the juror's responses during voir dire. For example, regarding criminal history, Juror 16 checked the box on the questionnaire indicating that the juror or an acquaintance he knew had been accused, arrested, placed under investigation, or convicted of a crime. But when prompted to explain on the questionnaire, the juror failed to do so. Only when asked during voir dire did Juror 16 disclose that as a minor the juror aided and abetted the theft of a purse from a car. Juror 16 also acknowledged during voir dire that the juror had friends who had been convicted of drug possession and weapons offenses.

Further, the State explained that it was concerned about Juror 16's "intellectual capacity" to serve as a juror. The questionnaire asked Juror 16 if the juror had ever served on a jury. The juror answered the question "No." In the next question, Juror 16 was asked: "What did you think of the experience?" The juror responded: "[E]xperience is what you need to make a good living." The State's concern that Juror 16 gave a nonresponsive answer to the question is race neutral on its face.

■ Because the district court concluded that the State articulated race-neutral explanations for its peremptory challenge, the court then invited Diggins under step three to rebut those explanations. Diggins declined the invitation. Diggins now argues for the first time on appeal that the State's explanations were pretextual. In *State v. Scott*, we considered whether the defendant could argue for the first time on appeal that the State's explanation for exercising a peremptory challenge was pretextual. 493 N.W.2d 546, 549 (Minn.1992). We concluded that when a defendant believes that the State's explanation is pretextual, the defendant must present the argument to the district court on a timely basis or it is waived, "unless the record on appeal *clearly establishes as a matter of law* that the [State's] neutral explanation was pretextual and that the striking of the juror was racially motivated." *Id.* (emphasis added).

Like *Scott,* Diggins failed to timely argue that the State's explanations for exercising the peremptory challenge were pretextual. Diggins therefore waived his right to present that argument on appeal and cannot prevail unless the record "clearly establishes as a matter of law" that the State's peremptory challenge was racially motivated.

■ We conclude that the record does not clearly establish as a matter of law that the State's explanations were pretextual and that striking Juror 16 was racially motivated. The State's peremptory challenge did not result in the disproportionate exclusion of racial minorities from the jury. *See State v. Greenleaf,* 591 N.W.2d 488, 500 (Minn.1999). Indeed, before striking Juror 16, the State accepted Juror 4, who is African American, to sit on the jury. *See State v. Everett,* 472 N.W.2d 864, 869 (Minn.1991) (considering it "significant that the jury ultimately included a member of a minority" race).

Diggins vaguely contends that white Jurors 1 and 20 responded during voir dire in a similar fashion to Juror 16 and were not struck by the State. The United States Supreme Court has concluded that if an explanation given for striking a prospective juror applies equally to an otherwise-similar nonminority prospective juror who is permitted to serve, such evidence tends to prove purposeful discrimination. *Miller–El,* 545 U.S. at 241, 125 S.Ct. 2317; *see also State v. Dobbins,* 725 N.W.2d 492, 501 (Minn.2006). The district court concluded that the inconsistencies between Juror 16's responses during voir dire and answers on the questionnaire were significant and constituted a race-neutral reason for striking the juror. Diggins failed to present any evidence that the responses given by Jurors 1 and 20 were similarly inconsistent.

In summary, the State articulated race-neutral explanations for exercising the peremptory challenge, and Diggins failed to prove that the challenge constituted purposeful racial discrimination. Consequently, we conclude that the district court did not err by overruling Diggins' objection to the State's peremptory challenge of Juror 16.

II.

■ Diggins next argues that the district court erred by admitting evidence that he assaulted and threatened S.H. two days before trial. Diggins argues that the State's presentation of that evidence was substantially more prejudicial than probative and influenced the jury's verdict. According to Diggins, the court failed to restrict the amount of evidence introduced and the State improperly used the evidence in its closing argument to depict Diggins as a violent person and to bolster S.H.'s credibility. We review a district court's decision to admit evidence for an abuse of discretion. *Holt v. State,* 772 N.W.2d 470, 481 (Minn.2009). We defer to the court's evidentiary rulings because the court stands "in the best position to evaluate the prejudicial nature" of evidence. *State v. Mayhorn,* 720 N.W.2d 776, 783 (Minn.2006).

■ Generally, "[a]ll relevant evidence is admissible." Minn. R. Evid. 402. Evidence of a threat made by the defendant against a witness is relevant to show the defendant's "consciousness of guilt." *State v. Harris,* 521 N.W.2d 348, 351, 353 (Minn. 1994) (holding that evidence of death threats made against three witnesses, including phone calls at home, was relevant to show consciousness of guilt); *see also Mayhorn,* 720 N.W.2d at 783 (holding that evidence of voicemail messages sent to a witness threatening: " 'What's up man? You don't f* * * with the ni* * *r no more. You need to holler at your boy straight up' ", was relevant to show con-

sciousness of guilt); *State v. Redding*, 422 N.W.2d 260, 263 (Minn.1988) (holding that evidence showing the defendant beat his sister after she called him a "punk" and accused him of murdering the victim was relevant to show consciousness of guilt).

But relevant threat evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Minn. R. Evid. 403; *State v. Clifton*, 701 N.W.2d 793, 797 (Minn.2005). Further, threat evidence is not admissible if it tends to show the defendant was predisposed to commit the crime charged. *Harris*, 521 N.W.2d at 353. Thus, if the district court admits threat evidence to show consciousness of guilt, it must "provide safeguards" to prevent the evidence from being misused. *Compare Holt*, 772 N.W.2d at 482 (deferring to the district court's admission of direct-threat evidence when the court restricted the amount of evidence introduced and provided a cautionary instruction to the jury), *with Harris*, 521 N.W.2d at 352–53 (reversing the district court's admission of third-party-threat evidence when the court failed to restrict the amount of evidence introduced and failed to provide a cautionary instruction to the jury).

Here, the district court ruled that the evidence of the assault and threat was "highly probative" to show Diggins' consciousness of guilt, and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to the jury. The court restricted the amount of evidence introduced to the testimony of S.H., one officer who witnessed the assault, and another officer who heard Diggins accuse S.H. of snitching. Further, the court instructed the jury on the limited purpose of the evidence before the testimony of S.H., the testimony of the two officers, and the State's closing argument.

Consistent with the model jury instruction, the court cautioned the jury that it was "not to convict [Diggins] on the basis of the occurrences in the jail." *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 2.01 (5th ed. 2006) (Cautionary Instruction on Receipt of Testimony of Other Crimes or Occurrences). This cautionary instruction alleviated any possibility that admission of the evidence would unfairly prejudice the jury.

We conclude that the district court did not abuse its discretion by admitting evidence that Diggins assaulted and threatened S.H. two days before trial to prove consciousness of guilt. The court properly weighed the probative value of the evidence against the danger of unfair prejudice and provided safeguards to ensure that the evidence would not unduly influence the jury's verdict.

## III.

Finally, Diggins has filed a motion to submit a supplemental brief to address claims that the evidence was insufficient to support the verdict, that the prosecutor committed misconduct, and that the jury instructions were improper. Diggins urges the court to allow him to assert these claims in the "interests of justice." We conclude that allowing Diggins to file a supplemental brief at such a late stage in this appeal—an appeal that was filed over four and a half years ago—does not serve the interests of justice. Diggins' current counsel filed a notice of appearance on November 16, 2012. Diggins did not file this motion until January 30, 2013, two and one-half months after the notice of appearance and five days before oral argument. Diggins had ample opportunity to file this motion in a more timely fashion and permit the court sufficient time to consider the merits of his additional claims, but

failed to do so. Accordingly, we deny Diggins' motion to submit a supplemental brief. *See* Minn. R.Crim. P. 29.01, subd. 2; Minn. R. Civ.App. P. 128.02, subd. 5 (providing that no additional briefs may be filed except with leave of the court).

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.