*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0783**

State of Minnesota,
Respondent,

vs.

Ishamel Portwood Middlebrook,
Appellant.

**Filed August 1, 2016
Affirmed in part, reversed in part, and remanded
Hooten, Judge**

Hennepin County District Court
File No. 27-CR-14-22112

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Stan Keillor, Special Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Hooten, Presiding Judge; Worke, Judge; and Smith, Tracy M., Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from his conviction of aiding and abetting first-degree aggravated robbery, appellant argues that (1) the district court clearly erred by denying his *Batson*

challenge to the state's peremptory strike of the only African American prospective juror; (2) the district court committed plain error affecting his substantial rights by admitting a private surveillance video that had been edited by the system owner and was accompanied by the owner's lay opinion testimony as to what the video depicted; (3) the prosecutor committed prejudicial misconduct by misstating the evidence and making improper arguments during closing argument; (4) the evidence was insufficient to sustain his conviction; (5) the district court abused its discretion by imposing a "middle of the box" guidelines sentence; and (6) the district court erred by ordering appellant to pay restitution. We affirm appellant's conviction and sentence, but remand to allow appellant the opportunity to request a restitution hearing.

## FACTS

Appellant Ishamel Portwood Middlebrook was charged with one count of aiding and abetting first-degree aggravated robbery and one count of aiding and abetting kidnapping, arising out of an incident that took place on July 29, 2014. A jury trial was held in January 2015. The state introduced the following evidence at trial.

Around 1:00 a.m. on July 29, the victim, H.L., left her home in South Minneapolis to walk to a bar located at 26th Street and Lyndale Avenue. H.L. cut through a parking lot, and then two men approached her from behind, took her purse, and ripped her backpack off her back. Her backpack contained her driver's license, a debit card, a small amount of cash, and a can of mace, among other items. One of the men, who had glasses and was wearing a t-shirt and red pants, stepped in front of H.L. The man in red pants, later identified as Kevin Jones, demanded H.L.'s phone. She refused to give him her phone.

2

Jones pulled out a gun, pointed it at H.L.'s face, threatened to kill her, and again demanded her phone. She gave him her phone. The other man, later identified as Jeremy Burton, initially remained behind H.L. Burton was larger than Jones, had dreadlocks, wore a white t-shirt, and was holding H.L.'s purse and looking through it.

Jones forced H.L. to walk south down Lyndale Avenue between him and Burton, holding her by the neck and continuing to threaten her and demand money or anything of value. When H.L. insisted that she did not have more money, the men accused her of having money in her bra. H.L. took off her bra to prove to them that she did not, and Jones threw it on the sidewalk. Jones punched H.L. in the face and hit her across the head with the gun.

Meanwhile, a Cadillac drove south on Lyndale Avenue, turned right at 25th Street, and pulled over just past the corner. This Cadillac was owned by Middlebrook's girlfriend, who had loaned it to him sometime after 11:00 p.m. on July 28 after Middlebrook's friend, Peter Redditt, had called and asked for a ride. The Cadillac moved in reverse several feet and then stopped, bringing it more in line with the sidewalk on Lyndale Avenue. The occupants of the stopped Cadillac looked north down the sidewalk toward 24th Street. Approximately 50 seconds after stopping, the Cadillac moved forward, as H.L. and her assailants continued walking south on Lyndale Avenue between 24th Street and 25th Street. The Cadillac pulled into the alley of the 2400 block between Lyndale Avenue and Aldrich Avenue, which is one block west of Lyndale.

Jones forced H.L. to turn and walk west on 25th Street toward Aldrich Avenue, still threatening to kill her if she did anything stupid. Meanwhile, the front seat passenger in

3

the Cadillac exited the vehicle and then walked east on 25th Street, passing H.L. and her assailants and offering H.L.'s assailants some kind of hand gesture or slap as he did so. H.L. and the two men reached the alley where the Cadillac was stopped, walked just past the alley, and stopped. The front seat passenger climbed the fence of a house on Lyndale Avenue, cut through the yard and into the alley, and reentered the Cadillac. Some communication took place between the occupants of the car and the assailants; at one point, Jones looked over his shoulder and spoke toward the car. H.L. thought that she heard someone say something like, "Let's go." Burton demanded H.L.'s passcode to her cell phone. After she told him the passcode, Burton walked toward the Cadillac with her cell phone and her purse and got in the back seat of the car. Jones then threatened to shoot H.L. if she did not lie down on the ground, and when she began to do so, he ran to the Cadillac and got in, and the vehicle drove quickly away.

H.L. immediately went to a house in which she had previously lived, called 911, and called her bank to cancel her debit card. Police arrived while H.L. was on the phone with the bank. The bank representative told her that an attempt had just been made to use her card at a gas station in North Minneapolis, which was a five or ten minute drive away. H.L. relayed the information to an officer who was present, and the officer radioed the information to other officers.

Minneapolis Police Officer Brandon Bartholomew heard the dispatch describing the license plate number of a vehicle involved in a robbery. Shortly thereafter, Officer Bartholomew was advised by dispatch that a debit card taken in the robbery had been used at the gas station, which was located less than a mile from his location. Officer

4

Bartholomew eventually saw the suspect vehicle. He followed the vehicle and, when it stopped and one of the occupants jumped out, Officer Bartholomew ordered him and everyone in the car to show their hands.

Other officers arrived and identified the vehicle's occupants. Middlebrook was the driver of the vehicle, Redditt was the front passenger, Jones was a rear passenger, and Burton was the person who had jumped out of the vehicle when it was stopped by Officer Bartholomew. After stopping the vehicle, Officer Bartholomew recovered a gun on the boulevard near where Burton had exited the vehicle. He also recovered H.L.'s driver's license and debit card from the driver's seat of the vehicle and a can of mace from the rear seat behind the driver. H.L. later identified Jones as the male with the gun, Burton as the male with her backpack, and Redditt as the passenger of the Cadillac who had jumped out during the robbery and then cut through a neighbor's yard to get back into the vehicle.

Minneapolis Police Sergeant Kelly O'Rourke reviewed video from the gas station, which showed the Cadillac driving into the station at 1:20 a.m. and Middlebrook exiting the driver's door and attempting to use H.L.'s debit card at the gas pump. Sergeant O'Rourke interviewed Middlebrook the next day, July 30. During the interview, Middlebrook stated that, during the early morning hours of July 29, he picked up Redditt and then smoked marijuana and PCP and drove around. He stated that Jones and Burton were his friends. He denied being in South Minneapolis at any point in the evening.

At trial, in addition to the testimony of the police officers and H.L., the state also showed the jury excerpts of a multi-camera home security video that depicted some of the events surrounding the robbery and kidnapping charges. The video belonged to J.F., a 40-

5

year resident of the neighborhood who testified regarding how the video was created and the locations of the cameras.

The jury found Middlebrook guilty of aiding and abetting first-degree aggravated robbery, but acquitted him of aiding and abetting kidnapping. The district court sentenced him to 98 months in prison, which was the middle of the presumptive sentencing guidelines range. The district court later ordered Middlebrook to pay restitution in the amount of $1,061.44. This appeal followed.

# D E C I S I O N

## I.

Middlebrook argues that the district court clearly erred by overruling his *Batson* objection to the state's peremptory strike of the only African American prospective juror, L.F. In a jury trial, each party has a limited number of peremptory challenges. Minn. R. Crim. P. 26.02, subd. 6. "Unlike a challenge for cause, a peremptory challenge allows a party to strike a prospective juror without having to explain the reason for the strike." *State v. Diggins*, 836 N.W.2d 349, 354 (Minn. 2013). "The Equal Protection Clause of the Fourteenth Amendment, however, prohibits purposeful racial discrimination in jury selection, and in particular prohibits the [s]tate from using a peremptory challenge to strike a prospective juror on the basis of the juror's race." *Id.* (citing *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986)). The Minnesota Supreme Court has adopted the three-step *Batson* framework for determining whether a peremptory strike was motivated by racial discrimination. *State v. Martin*, 773 N.W.2d 89, 101 (Minn. 2009).

Under *Batson*: (1) the defendant must make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the juror in question; and (3) the district court must determine whether the defendant has carried the burden of proving purposeful discrimination.

*Id.*; *see also* Minn. R. Crim. P. 26.02, subd. 7(3) (codifying the three-step *Batson* framework).

Whether a peremptory strike was based on racial discrimination is a factual determination, and appellate courts "give great deference to the district court's ruling and will not reverse unless it is clearly erroneous." *Martin*, 773 N.W.2d at 101. "[Great] deference is warranted because the district court occupies a unique position to observe the demeanor of the prospective juror and evaluate the credibility of the party that exercised the peremptory challenge, and the record may not reflect all of the relevant circumstances that the [district] court may consider." *Diggins*, 836 N.W.2d at 355 (quotation omitted).

During voir dire, the district court asked if any juror had "ever been a witness in a court case or actually testified." L.F. reported that she had testified on behalf of the state against her brother in a criminal case. After discussing this experience, L.F. added, "I also was a witness when I was called on jury duty before." The following exchange took place as the district court tried to clarify her statement:

> JUROR: Well, I wasn't a witness but it was something like when we went on the site and it was kind of hard for me to, you know, it was just kind of hard for me to, you know—
> THE COURT: You were on a jury before?
> JUROR: Yes.
> THE COURT: You didn't have to testify did you?
> JUROR: Well, no. Deliberation was a little bit difficult.

7

After establishing that L.F. had been a juror in a child abuse case, the district court asked her, "Did you feel the process was fair?" L.F. replied, "No." L.F. explained that she and the other jurors were taken to the crime scene and, while at the scene, she felt like "there wasn't enough evidence for me to, you know, consider what [a witness] said and what we saw." The district court repeated its question: "I said was it fair and you said no[;] what part of the process don't you think was fair?" L.F. answered that she felt it was impossible for the witness to have seen the crime from a certain vantage point. The district court repeated, "So what part wasn't fair, then?" L.F. replied that she and her fellow jurors went back to the courthouse to continue deliberating, and she told the other jurors that "there wasn't enough evidence." The district court again repeated, "So what part wasn't fair, then? Why do you say it wasn't fair?" In response, L.F. stated, "Well everybody else said it was—she—they was—I mean that guy that did it was innocent and I didn't think that he [was]." In an attempt to clarify her statement, the district court asked, "You thought he was innocent or not innocent?" L.F. responded, "I thought he was innocent and they thought he was guilty." The district court asked, "[W]hat happened?" L.F. responded, "[H]e was set free." The district court, still trying to discern why L.F. thought that the trial was unfair, asked, "You reached a verdict?" L.F. answered affirmatively and stated, "I thought he was innocent." The district court, in trying to clarify her answer, asked, "But did[] the jury come back innocent or not guilty?" When L.F. answered, "The jury came back, um. . . ," the district court reminded her that she had already said that "he was set free." L.F., responding in the affirmative that he was "let free so he was innocent,"

8

eventually agreed that that result was fair. In trying again to clarify L.F.'s initial statement, the district court asked, "So then when I go back to when you say you didn't think the process was fair, it sounds like it worked the way it was supposed to in your case," and L.F. interjected, "It was just like 11 people[] against 12. I mean, I'm sorry. I'm sorry. It was like 1 person against 12 others. You know? And they [were] trying to get me to, you know, go the other way."

Later, defense counsel asked L.F. if nervousness might be normal for some witnesses, and L.F. responded "[N]o." When asked to explain her answer, L.F. stated, "[I]f I see—if I hear something that is not—if I hear something that is not correct, that I don't think that is correct, I probably would—I would sleep on something like that one." Defense counsel, in trying to clarify her answer, noted that what she was describing sounded like inconsistent testimony, not nervousness. L.F. agreed. Defense counsel repeated his question: "Okay. But going to a witness being nervous, do you think that might be pretty normal?" L.F. answered, "Yes."

At the close of voir dire, the prosecutor exercised a peremptory challenge of L.F., and defense counsel raised a *Batson* objection. Defense counsel noted that L.F. was the only African American member of the venire and that Middlebrook was African American. Defense counsel argued that, "if anything, [L.F.] would be a pro-prosecution witness" because she testified for the state in another case. The district court, without determining whether Middlebrook had made a prima facie showing that the prosecutor exercised his peremptory challenge on the basis of race (step one of *Batson*), allowed the prosecutor to articulate a race-neutral explanation for the strike (step two). The prosecutor stated that he

9

struck L.F. due to the "confusing nature" of her responses to the district court's question about fairness in the judicial system and to defense counsel's question about witness nervousness. The prosecutor explained: "If I have . . . a juror that I think is having . . . difficulty in analyzing the information and questions that [are] coming in and not weighing those in a logical way, that's always a juror that is a concern to me. That's why I struck her."

The district court agreed with the prosecutor that "[t]here definitely was confusion" in her responses. The district court then concluded that Middlebrook had not met his burden under step one because, while L.F. was a racial minority, the circumstances raised no inference that the strike was based on her race. The district court noted that an Asian American member of the venire was going to be seated on the jury. The district court proceeded to analyze step two, "just for appellate purposes." The district court stated that it "accept[ed]" the prosecutor's race-neutral reason for striking L.F., noting that "she certainly was confused about . . . her experience as a juror and a witness." The district court stated that, because it accepted the prosecutor's race-neutral reason, "we don't even get to the third prong."

We conclude that the district court improperly applied the *Batson* framework because it allowed the prosecutor to articulate a race-neutral explanation for the strike before ruling on whether defense counsel had made a prima facie showing, and it did not give defense counsel the opportunity to prove that the prosecutor's race-neutral explanation was pretextual. *See* Minn. R. Crim. P. 26.02, subd. 7(3) (describing the three-step analysis). The supreme court has stated that, if the district court errs in applying the *Batson*

10

framework, the reviewing court will apply *Batson* by "examin[ing] the record without deferring to the district court's analysis." *State v. Pendleton*, 725 N.W.2d 717, 726 (Minn. 2007).

The first step is to determine whether Middlebrook made out a prima facie case of racial discrimination. *Id.* "The opponent of a peremptory challenge establishes a prima facie case under *Batson* by showing (1) that a member of a protected racial group has been peremptorily excluded from the jury and (2) that circumstances of the case raise an inference that the exclusion was based on race." *Id.* (quotation omitted). "Whether the circumstances of the case raise an inference of discrimination depends in part on the races of the defendant and the victim." *Angus v. State*, 695 N.W.2d 109, 117 (Minn. 2005). "[An] inference of discrimination can be drawn by proof of disproportionate impact upon the racial group . . . ." *State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989). Here, the victim was white, while Middlebrook and L.F. were African American. And, the peremptory strike of L.F. had a disproportionate impact upon the racial group because she was the only African American prospective juror. These circumstances are likely sufficient to raise an inference of discrimination and to satisfy step one of *Batson*, but we need not resolve this question because Middlebrook's claim fails on the second and third steps.

The second step is to determine whether the prosecutor provided a race-neutral explanation for the peremptory strike. *Pendleton*, 725 N.W.2d at 726. "[T]he explanation will be deemed race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation." *Id.* (quotation omitted). Here, the prosecutor's stated reason for the strike was the "confusing nature" of some of L.F.'s answers. This is a race-neutral explanation,

11

as Middlebrook concedes, because there is nothing inherently discriminatory in the prosecutor's concern about L.F.'s ability to comprehend the nature of court proceedings.

The third step is to determine "whether the defendant carried his burden of proving that the peremptory strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive." *Id.* (quotation omitted). The district court did not give defense counsel an opportunity to respond to the state's reason for the strike. However, in reviewing the record, we conclude that defense counsel would not have been able to rebut the state's race-neutral reason. First, during her exchange with the district court, L.F. had difficulty differentiating between her roles as a witness and as a juror in prior trials. Second, L.F. had great difficulty in differentiating between fairness in the criminal justice system and the stress and so-called unfairness of being a holdout juror in a previous trial where the other jurors eventually came around to her position that the defendant was not guilty. Third, when defense counsel asked L.F. about whether nervousness was normal for a witness who is testifying, she answered, "No" and when pressed for an explanation, her answer was nonresponsive and she seemed confused. Only a few questions later, she changed her answer to, "Yes." Given these clear indications that L.F. was confused with basic questioning, which would likely impair her ability to understand the district court's instructions regarding the law and to communicate with other jurors, we conclude that defense counsel would not have been able to prove that the prosecutor's stated reason for the strike was merely a pretext for excluding L.F. based on her race. Accordingly, the district court did not clearly err by overruling Middlebrook's *Batson* objection.

12

**II.**

The district court allowed into evidence, without objection, a composite videotape taken from multiple surveillance cameras installed by J.F. at his residence near 25th Street and Lyndale Avenue, which captured video of the robbery. Middlebrook argues that the district court erred by admitting this evidence because the videotape was "highly edited" and J.F.'s lay opinion testimony during the showing of the videotape was improper.

Because Middlebrook failed to object at trial, we review for plain error affecting substantial rights. *State v. Smith*, 825 N.W.2d 131, 138 (Minn. App. 2012), *review denied* (Minn. Mar. 19, 2013). The plain error standard requires Middlebrook to show (1) error, (2) that was plain, and (3) that affected his substantial rights. *Id.* "If all three prongs are met, this court may correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted). "An error is plain if it is clear and obvious; usually this means [that the error] violates or contradicts case law, a rule, or an applicable standard of conduct." *State v. Matthews*, 779 N.W.2d 543, 549 (Minn. 2010). Plain error "affects a defendant's substantial rights if there is a reasonable likelihood that the error had a significant effect on the jury's verdict." *State v. Milton*, 821 N.W.2d 789, 809 (Minn. 2012) (quotations omitted).

**Edited videotape**

J.F. has installed a total of 16 high-definition security cameras around his house, with eight on the front of the house and eight on the back. The video from the cameras feeds into two recorders and can also be viewed in real time from inside J.F.'s house. J.F. has worked with police and advised businesses on the installation and use of video

surveillance systems. His cameras record portions of Lyndale Avenue, 25th Street, and the alley between Lyndale Avenue and Aldrich Avenue. He also has a motion detection system installed in his backyard that triggers high-powered lights and an alarm. J.F.'s cameras recorded events that occurred on Lyndale Avenue, on 25th Street, and in the alley behind Lyndale Avenue in the early morning hours of July 29, 2014.

Middlebrook concedes that unedited surveillance video footage from J.F.'s video cameras "would have been admissible, as against a foundational objection, based on [J.F.'s] personal knowledge of the camera system and his recognition of the images captured by it." *See* Minn. R. Evid. 901(b)(1), (9) (indicating that authentication requirement may be satisfied if witness has knowledge of evidence or describes a process or system that produces an accurate result). But, Middlebrook contends that the district court plainly erred by admitting "a heavily edited version of the videotape." He points out that the videotape consists of a composite of camera views that J.F. selected and edited, at times rewinding, at times slowing the playback speed, and at times showing a single camera view. He also contends that the videotape was edited to reflect J.F.'s "highly incriminatory viewpoint."

Middlebrook cites two cases in support of his argument. In *State v. Brown*, the supreme court stated that when a videotape is duplicated and digitized, "there is the risk of manipulation or distortion." 739 N.W.2d 716, 723 (Minn. 2007). But, *Brown* does not support Middlebrook's contention that the district court erred by admitting the videotape because J.F. acknowledged during his testimony that he manipulated the video, presumably in order to capture the best views of what he considered to be the most relevant video

14

segments for the jury to see. In *State v. Ali*, the supreme court held that the district court did not abuse its discretion by admitting expert testimony to explain why surveillance videotapes were "digitally manipulated to clarify details in the tape[s]." 855 N.W.2d 235, 250–52 (Minn. 2014). However, *Ali* is inapposite because the current case does not involve expert testimony. Under these circumstances, and in light of this case law, we conclude that even if the district court erred by allowing the state to present an edited version of the videotape, Middlebrook has not shown that any error was plain. *See Matthews*, 779 N.W.2d at 549 (stating that error is "plain" if it "violates or contradicts case law, a rule, or an applicable standard of conduct").

**Lay opinion testimony**

Middlebrook next argues that the district court plainly erred by allowing J.F. to offer improper lay opinion testimony while the video was played for the jury. The rules of evidence provide:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Minn. R. Evid. 701. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. To determine whether opinion testimony is helpful to the jury, "a distinction should be made between opinions as to factual matters," which are

15

helpful, "and opinions involving a legal analysis or mixed questions of law and fact," which are unhelpful. Minn. R. Evid. 704 1977 comm. cmt.

While testifying, J.F. described to the jury what the video depicted and showed the jury a diagram he had drawn that illustrated the scene. While the jury viewed the Cadillac turning west onto 25th Street, parking, and moving in reverse, J.F. stated that the driver would be able to see down the sidewalk looking north on Lyndale Avenue. J.F. then stated that the occupants of the Cadillac were "looking down the sidewalk to see what they can see down [t]here." Defense counsel objected to this last statement on foundational grounds, arguing that J.F. could testify as to what the video showed, but that it was improper for him "to characterize what [the] people in the car [were] doing." The district court sustained the objection. Later, the district court sustained another defense objection when J.F. stated that the occupants of the Cadillac could see H.L. and her assailants from inside the vehicle because H.L. and her assailants were walking under a streetlight. On two other occasions on direct examination, however, J.F. testified that the occupants of the vehicle were looking north on Lyndale Avenue, which defense counsel did not object to. To the extent that Middlebrook is arguing that the district court erred by not sua sponte striking this testimony or admonishing J.F., this argument is unavailing because J.F. was testifying as to his opinion of what the occupants of the vehicle were doing, based on his perception of the videotape, and his testimony was helpful to the jury's determination of Middlebrook's knowledge of the robbery. *See* Minn. R. Evid. 701 (requiring lay opinion testimony to be based on witness's perception and be helpful to jury). J.F. did not testify as to the "state of

16

mind" of the Cadillac's occupants, as Middlebrook argues, but rather to his own observations.

Middlebrook's general challenge to J.F.'s opinion testimony also fails. J.F.'s testimony was based on his personal knowledge of the area shown in the videotape and the area outside the reach of the cameras, as well as his personal experience with the video surveillance system that he had set up and maintained. By orienting the jury as to the location and direction of the cameras, describing the area, and recounting the events that he witnessed, J.F.'s testimony assisted the jury in understanding the videotape footage and in assessing Middlebrook's role in the robbery. *See State v. Pak*, 787 N.W.2d 623, 629 (Minn. App. 2010) ("A lay witness's opinion or inference testimony may help the jury by illustrating the witness's perception in a way that the mere recitation of objective observations cannot."). Moreover, J.F.'s opinion testimony did not involve legal analysis, but related to factual matters: whether the vehicle's occupants could have seen or did see H.L. and her assailants walking south on Lyndale Avenue, and whether the vehicle's occupants waited for the assailants in the alley behind J.F.'s house. *See* Minn. R. Evid. 704 1977 comm. cmt. (stating that witness's testimony as to factual matters are helpful to jury). We therefore conclude that Middlebrook has not shown that the district court plainly erred by allowing J.F. to offer his lay opinion testimony.

## III.

Middlebrook argues that the prosecutor committed misconduct during closing argument by (1) repeatedly stating that certain evidence was "undisputed"; (2) making an "accountability" argument; and (3) misstating the evidence by declaring that Middlebrook

17

dropped off Jones and Burton near 22nd Street and Lyndale Avenue. We review claims of unobjected-to prosecutorial misconduct for plain error affecting substantial rights. *State v. Ramey*, 721 N.W.2d 294, 299 (Minn. 2006). Under the supreme court's modified plain error test, the defendant must show that the prosecutor's conduct constitutes error that was plain, but the burden then shifts to the state "to demonstrate lack of prejudice; that is, [that] the misconduct did not affect substantial rights." *Id.* at 302.

During closing argument, a prosecutor "may present all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence." *State v. Munt*, 831 N.W.2d 569, 587 (Minn. 2013) (quotation omitted). In reviewing claims of prosecutorial misconduct, appellate courts review the closing argument "as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence to determine whether reversible error has occurred." *Id.* (quotation omitted).

There is no merit to Middlebrook's argument that the prosecutor's reference to certain evidence being undisputed, as well as his entreaty to the jury that it hold Middlebrook accountable, constituted misconduct. At the beginning of his closing argument, the prosecutor stated that there was no dispute in this case that a robbery occurred and that the jury's job was to decide whether Middlebrook aided and abetted that robbery. This is nothing like what happened in *State v. Porter*, the case Middlebrook relies on, where the supreme court concluded that it was prosecutorial misconduct for the prosecutor to refer to the defendant's failure to impeach one of the state's witnesses by using the phrase "without impeachment by any cross-examination," reasoning that "[a] prosecutor may not comment on a defendant's failure to call witnesses or to contradict

18

testimony." 526 N.W.2d 359, 364–65 (Minn. 1995). As to the prosecutor's statement

urging the jury to hold Middlebrook accountable for his actions on the night of the offense,

the argument was very brief and came at the end of a lengthy closing argument and rebuttal.

As to the prosecutor's statement that Middlebrook dropped off Jones and Burton

near the Super America, the prosecutor stated:

> Due to the timing of this and then the diagram by [J.F.], you literally know that Cadillac drove down Lyndale Avenue as [H.L.], Mr. Burton, [and] Mr. Jones were walking down that [sidewalk]. That car went right past those two men and that lady. *So make no mistake, at some point those men were dropped off somewhere. . . .*
> And that Cadillac—*so he knows he's got two occupants less than he used to have* and now those two occupants that are hard to miss, Mr. Red Pants and the big dude, cruising down that street, now with a girl wedged in between them, now with a gun to the head of that girl that's wedged in between them.

(Emphasis added.) Middlebrook is correct that the state introduced no evidence of what

happened before the robbery and, specifically, of whether Middlebrook dropped off Jones

and Burton before the robbery. But, the state argues that, based on all the evidence, it was

reasonable to infer that Middlebrook dropped the two assailants off, and a prosecutor may

argue reasonable inferences. *State v. Bobo*, 770 N.W.2d 129, 142 (Minn. 2009) ("During

closing argument, a prosecutor may argue all reasonable inferences from evidence in the

record."). We agree that it was a fair inference that Middlebrook dropped off Jones and

Burton before the robbery. Accordingly, we conclude that Middlebrook has not shown

that the prosecutor's argument constituted plain error.

19

**IV.**

Middlebrook challenges the sufficiency of the evidence, arguing that the evidence produced at trial did not exclude a rational hypothesis that his presence near the scene of the aggravated robbery was not intended to aid and abet that crime. He does not, however, dispute that Jones and Burton committed aggravated robbery. "In reviewing a sufficiency of the evidence challenge, we review the record in the light most favorable to the conviction to determine whether the evidence reasonably could have permitted the jury to convict." *State v. Henderson*, 620 N.W.2d 688, 704–05 (Minn. 2001).

"Whoever, while committing a robbery, is armed with a dangerous weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a dangerous weapon, or inflicts bodily harm upon another, is guilty of aggravated robbery in the first degree . . . ." Minn. Stat. § 609.245, subd. 1 (2012). Under the accomplice liability statute, "[a] person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2012).

> To be guilty of aiding and abetting a crime, the defendant does not need to have participated actively in the actual commission of the crime. But the [s]tate must prove that the defendant had knowledge of the crime and intended his presence or actions to further the commission of that crime.

*State v. Hawes*, 801 N.W.2d 659, 668 (Minn. 2011) (quotation and citation omitted). To determine whether a defendant possessed the requisite state of mind for accomplice liability, the jury may consider circumstantial evidence, "including the defendant's presence at the scene of the crime, a close association with the principal offender before

20

and after the crime, a lack of objection or surprise under the circumstances, and flight from the scene of the crime with the principal offender." *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015).

Because there is no direct evidence of whether Middlebrook intended to aid and abet the aggravated robbery, we apply the two-step circumstantial evidence test. *See State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). "The first step is to identify the circumstances proved. In identifying the circumstances proved, we defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *Id.* at 598–99 (quotations and citation omitted). In other words, "we consider only those circumstances that are consistent with the verdict. This is because the jury is in the best position to evaluate the credibility of the evidence even in cases based on circumstantial evidence." *Id.* at 599 (citation omitted). "The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotations omitted).

The evidence introduced at trial established the following circumstances. Middlebrook borrowed his girlfriend's Cadillac sometime after 11:00 p.m. on July 28, 2014, in order to give his friend Redditt a ride. Around 1:00 a.m. on July 29, Middlebrook's friends, Jones and Burton, robbed H.L. at gunpoint in South Minneapolis. During the robbery, H.L., Jones, and Burton walked south on Lyndale Avenue toward 25th Street. As the three were walking, the Cadillac drove past them southbound on Lyndale Avenue, turned west onto 25th Street, and pulled over just past the corner. The Cadillac reversed

21

and moved backwards several feet, bringing the vehicle more in line with the sidewalk on Lyndale Avenue. The surveillance video appears to show all three occupants of the Cadillac looking north down the sidewalk toward 24th Street, where H.L. and her assailants were walking south toward the Cadillac. Approximately 50 seconds later, the Cadillac moved forward again and turned into the alley between Lyndale and Aldrich Avenues. The front passenger got out of the Cadillac and walked east along 25th Street, as H.L. and her assailants turned west onto 25th Street. As the front passenger passed the group, he offered the assailants some kind of hand gesture or slap. The front passenger then jumped the fence of a house on Lyndale Avenue, cut through the yard, and returned to the alley, where he got back in the Cadillac. Moments later, Burton and Jones got in the back seat of the Cadillac, which quickly drove away. Minutes later, the Cadillac pulled into a North Minneapolis gas station. Middlebrook, the driver, got out and tried to use H.L.'s debit card at the gas pump. Shortly thereafter, police spotted the Cadillac and effected a traffic stop. Middlebrook pulled the Cadillac over, and Burton tried to flee, tossing the gun that Jones had used during the robbery. The Cadillac's occupants included Middlebrook, Redditt, Jones, and Burton. Police found the victim's debit card, driver's license, and mace in the Cadillac.

These circumstances proved are consistent with guilt because they indicate that Middlebrook knew that Jones and Burton were robbing H.L. and that Middlebrook intended to further the commission of that crime by being the getaway driver.

Middlebrook argues that the circumstances proved are also consistent with a theory of innocence: that his "mere presence" near the scene of the robbery was not intended to

22

aid and abet that crime. Middlebrook reasons that (1) there was no evidence that he dropped off Jones and Burton prior to the robbery; (2) when Jones and Burton were forcing H.L. to walk south on Lyndale Avenue, "it was not obvious that a crime was occurring"; (3) the state's evidence did not show a "plan for a 'getaway' car"; and (4) Middlebrook's driving up the alley and his later use of H.L.'s debit card does not show foreknowledge of the robbery. We are not persuaded. Middlebrook completely ignores or minimizes the evidence of the three occupants of the Cadillac backing up to get a better view of the ongoing robbery, which they watched for approximately 50 seconds, as well as the communicative gesture between the front passenger of the Cadillac and the assailants shortly before the assailants released H.L. and got into the Cadillac. We conclude that the circumstances proved are inconsistent with Middlebrook's theory of innocence.

## V.

Middlebrook next challenges his sentence. Based on his criminal history score and the severity of the crime, the presumptive sentencing guidelines range for his conviction was an executed prison sentence of 84 to 117 months, with 98 months as the middle of the box. *See* Minn. Sent. Guidelines 4.A (Supp. 2013). Middlebrook argues that the district court abused its discretion by imposing a sentence of 98 months instead of 84 months given his "minor role" in the offense, pointing out that the same sentencing judge allegedly imposed sentences of 56 and 68 months on the two principal offenders, who allegedly pleaded guilty to their offenses. He also argues that, by imposing a middle of the box sentence rather than a bottom of the box sentence, the district court "penalized" him for going to trial rather than pleading guilty.

23

A district court must impose a sentence within the presumptive range under the Minnesota Sentencing Guidelines unless the case involves "identifiable, substantial, and compelling circumstances." Minn. Sent. Guidelines 2.D.1 (Supp. 2013). "All three numbers in any given cell [on the sentencing guidelines grid] constitute an acceptable sentence . . . ." *State v. Jackson*, 749 N.W.2d 353, 359 n.2 (Minn. 2008). We review the district court's sentencing decision for an abuse of discretion. *State v. Delk*, 781 N.W.2d 426, 428 (Minn. App. 2010), *review denied* (Minn. July 20, 2010). So long as the sentencing court "carefully evaluated all the testimony and information presented before making a [sentencing] determination," we will not interfere with the district court's exercise of its discretion. *State v. Pegel*, 795 N.W.2d 251, 255 (Minn. App. 2011) (quotation omitted).

Our review of the sentencing transcript indicates that the district court carefully evaluated all of the arguments of counsel and the other information that the district court had before it, including the presentence investigation report, before making its sentencing determination. Middlebrook took a risk when he decided to plead not guilty and go to trial, and the risk he took was that, if the jury found him guilty, he would likely receive a guidelines sentence, which was greater than the sentence he would have received had he accepted the state's plea offer. It is not the sentencing judge's role to renegotiate a sentence with a defendant who has been convicted. The district court did not "penalize" Middlebrook for taking his case to trial, and it did not abuse its discretion by sentencing him to the presumptive, middle of the box, guidelines sentence of 98 months in prison.

## VI.

Finally, Middlebrook argues that there is no factual basis for the amount of restitution ordered and that there is no evidence that he was ever served with the restitution order or given the opportunity to request a restitution hearing. Prior to sentencing, the state and Middlebrook negotiated a resolution to his two other pending felony cases. At the sentencing hearing, the state agreed to dismiss those cases, provided that the district court reserve the issue of restitution to the victim in one of the cases. This agreement was noted in the warrant of commitment. The issue of restitution for this case was not raised during the sentencing hearing. Five days after sentencing, the district court filed an order requiring Middlebrook to pay restitution to H.L. in the amount of $1,061.44. The order indicated that the restitution obligation was joint and several with Middlebrook's co-defendants.

District courts have "broad discretion" in awarding restitution, and appellate courts will reverse a restitution award only if the district court abuses that discretion. *See State v. Tenerelli*, 598 N.W.2d 668, 671–72 (Minn. 1999). In considering whether to order restitution, the district court must consider the economic loss sustained by the victim and the financial resources of the defendant. Minn. Stat. § 611A.045, subd. 1(a) (2014).

The restitution order does not give any factual basis for the restitution award, and the record does not contain an affidavit of the victim, or any other evidence, to provide such a basis. Further, there is no indication in the record that Middlebrook was given notice of the restitution order or that he was given an opportunity to request a restitution hearing, as due process requires. *See Hughes v. State*, 815 N.W.2d 602, 606 (Minn. 2012) (concluding that appellant's due process rights were not violated when he received notice

of restitution claim and received restitution hearing); *see also* Minn. Stat. § 611A.045, subd. 3(b) (2012) ("An offender may challenge restitution, but must do so by requesting a hearing within 30 days of receiving written notification of the amount of restitution requested, or within 30 days of sentencing, whichever is later."). The state does not appear to contest Middlebrook's assertion that the record does not contain a factual basis for the restitution award. And, the state concedes that the record is silent as to whether Middlebrook was served with the restitution order. Accordingly, we reverse the restitution order and remand for the district court to allow Middlebrook the opportunity to request a restitution hearing.

**Affirmed in part, reversed in part, and remanded.**